*This opinion is subject to administrative correction before final disposition.*

# United States Navy-Marine Corps
# Court of Criminal Appeals

_____

**UNITED STATES**
Appellee

v.

**Jonathan D. GURFEIN**
Major (O-4), U.S. Marine Corps
Appellant

**No. 201700345**

_____

Appeal from the United States Navy-Marine Corps Trial Judiciary.

Decided 10 May 2019.

*Military Judge*:
Commander Arthur Gaston, JAGC, USN.

Sentence adjudged 2 July 2017 by a general court-martial convened at Marine Corps Base Quantico, Virginia; Naval Support Activity Naples, Italy; and Kelley Barracks, Stuttgart, Germany, consisting of officer members. Sentence approved by convening authority: forfeiture of all pay and allowances, confinement for 2 years, and a dismissal.

*For Appellant*:
Mr. John N. Maher, Esq.;
Lieutenant Commander William L. Geraty, JAGC, USN.

*For Appellee:*
Captain Brian L. Farrell, USMC;
Major Kelli A. O'Neil, USMC.

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

_____

Before WOODARD, FULTON, AND CRISFIELD,
*Appellate Military Judges*

Judge CRISFIELD delivered the opinion of the Court, in which Chief Judge WOODARD and Senior Judge FULTON joined.

CRISFIELD, Judge:

A general court-martial consisting of officer members convicted the appellant, contrary to his pleas, of one specification of committing a lewd act against a child, one specification of indecent exposure to a child, and one specification of false official statement in violation of Articles 120b, 120c, and 107, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920b, 920c, and 907 (2016).[1]

The appellant raises eight assignments of error (AOEs): (1) the evidence is factually and legally insufficient to sustain the findings and sentence; (2) the trial counsel violated his discovery obligations by failing to provide material evidence to the defense; (3) the military judge abused his discretion by denying the defense request for the production of cellular telephone tower data related to the appellant's cell phone; (4) the trial counsel made improper comments during trial and in his closing argument by referring to the "dark web" and "child pornography"; (5) the military judge abused his discretion by failing to sever the sexual abuse specifications related to two separate incidents; (6) the cumulative effect of errors (1) through (5) resulted in a trial that was not correct in law and fact; (7) it was plain error for the military judge to fail to order a mistrial *sua sponte* after the trial counsel disobeyed his order to avoid certain argument in his closing statement; and (8) unlawful command influence adversely affected the results of the trial.[2]

After careful consideration of the record of trial and the pleadings of the parties, we are convinced that the findings and sentence are correct in law and fact, find no error materially prejudicial to the substantial rights of the appellant, and affirm the approved findings and sentence.

---

[1] Appellant was acquitted of one specification of committing a lewd act and one specification of indecent exposure, both alleged to have been committed against a different child victim in 2014.

[2] AOEs (7) and (8) were raised, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), in an unsigned appendix following appellate defense counsel's signatures and appear to have been drafted personally by the appellant. *See* Appellant's Brief of 20 Jun 2018, Appendix I at 1 ("Appellant, Major Jonathan D. Gurfein, personally requests the court to consider the following assignments of error.") Having considered them, we find them to be without merit. *See United States v. Clifton,* 35 M.J. 79 (C.M.A. 1992).

## I. BACKGROUND

The appellant was assigned to the headquarters of Marine Corps Forces Europe and Africa, in Stuttgart, Germany. He was charged with committing lewd acts upon children and indecent exposure to children for allegedly exposing his penis to two local national girls who were under the age of 12 in two separate incidents, one in 2014 and the other in 2016. The incidents took place in an area known as Leinfelden-Echterdingen, Germany, which is near Stuttgart. He was also charged with making a false official statement about the incidents when interrogated by a special agent of the Army Criminal Investigation Division (CID).

In the first incident, a 10-year-old German girl alleged that as she walked from her train stop to school on the morning of 5 December 2014, a black, two-door sports car with a license plate that included the letters "SIR" followed by 3 or 4 digits repeatedly drove past her, stopped, waited for her to pass, and then drove past her again. After doing this multiple times, the driver of the car said something to the young girl in a language other than German. When the girl looked over, the driver was sitting in the car "shaking" his exposed penis with his hand.

The girl immediately reported what she saw to a teacher at her school. The teacher informed the school principal who then notified the German police. The German police searched for the vehicle description and partial license plate in their databases, but did not search the database for vehicles registered to U.S. service members.

The members acquitted the appellant of the offenses related to this incident.

In the second incident, L.S., an 11-year-old German girl, alleged that as she was pushing her bicycle home from a horseback riding lesson on the afternoon of 20 September 2016, a black sports car repeatedly pulled in front of her, waited for her to pass, then pulled in front of her again. After doing this multiple times, the driver of the car said something to L.S. in a language other than German. When she looked over, the driver had his penis in his hand and was moving it around.

L.S. ran with her bike the rest of the short distance up a hill to her house and immediately told her parents, Mr. and Mrs. S, what had happened. Mr. S and L.S. got into the family's car and drove around to search for the vehicle while Mrs. S called the German police. In the car, L.S. told her father that the vehicle they were looking for was black and similar to the type used by a driving school they knew, which Mr. S knew to be a BMW Z3. Soon after leaving their house, L.S. and her father spotted a black BMW Z4, a vehicle visually similar to a Z3. L.S. said it was the car. Mr. S pulled his car up alongside

the suspect vehicle while the vehicle was stopped at a traffic light. L.S. identified the driver of the vehicle as the man who had exposed himself to her. Mr. S immediately called the German police and described what was happening. He dropped back behind the vehicle and took two pictures of it with his cell phone. The license plate was legible in the photos and read "S-IR2684." The first photo was time-stamped "1901" by Mr. S's cell phone.

Mr. S and L.S. followed the vehicle, which appellant subsequently admitted he was driving, through two traffic circles before the appellant abruptly made a U-turn and went back in the direction they had come from. Mr. S was able to follow. The appellant's vehicle got onto a highway on-ramp and quickly accelerated away from Mr. S's vehicle. After being on the highway for a short time, Mr. S noticed the appellant's vehicle up ahead veer from the left lane across the right lane and onto an exit ramp. Mr. S was unable to follow the appellant across the lanes of traffic and lost sight of the appellant's vehicle soon after the appellant took the exit ramp.

In the course of their investigation into the incident involving L.S., the German police extended their vehicle license plate search to a database that includes vehicle information for U.S. service members stationed in Germany. The license plate and vehicle type photographed by Mr. S matched a black BMW Z4 belonging to the appellant. During the time period of both incidents, the appellant was stationed in Stuttgart, lived off base, and commuted to work. At a German police photo lineup, Mr. S identified the appellant's photo as the man he saw driving the BMW Z4 on 20 September 2016.

When questioned on 3 October 2016 by special agents of the CID regarding the two incidents, the appellant waived his rights and admitted to being in the proximity of L.S.'s house on 20 September 2016 as he was returning home from work. He remembered stopping at the side of the road 5 to 10 minutes after leaving work to make cell phone calls to his wife and uncle on his government-issued Blackberry cell phone. He also recalled being followed by a vehicle after making the calls, but denied ever exposing himself to any young girls at any time or having any sexual ideations about children. The appellant's denial that he ever exposed his penis to any young girls was the factual basis for the false official statement specification.

CID determined that the appellant had used his government-issued identification card to "swipe-out" of his office building in Stuttgart just before 1834 on 20 September. He made a cell phone call to his wife at 1842, which lasted for less than four minutes, and a cell phone call to his uncle at 1847 that went unanswered.

Members acquitted the appellant of both alleged offenses related to the 2014 allegation. They convicted him of the Article 120b specification (committing a lewd act upon a child under 12) related to the 2016 incident, but did so

by exceptions.[3] They also convicted him of the Article 120c specification (indecent exposure) related to the 2016 incident. Following the members' pronouncement of their findings, the military judge conditionally dismissed the Article 120c specification, finding it to be an unreasonable multiplication of charges. The members also convicted the appellant of the Article 107 false official statement specification.

Additional facts necessary to resolution of the assignments of error are discussed below.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

We review questions of legal and factual sufficiency *de novo*. Art 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297-98, (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)).

The test for factual sufficiency is whether "after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant's guilt beyond a reasonable doubt." *Rosario*, 76 M.J. at 117 (citation, internal quotation marks, and emphasis omitted). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a reasonable doubt does not mean, however, that the evidence must be free from conflict. *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001).

In order to sustain the appellant's Article 120b conviction, the government must have proven beyond a reasonable doubt that:

> 1. The appellant committed a lewd act against L.S. by intentionally exposing his genitalia to her;
>
> 2. L.S. was under the age of twelve; and

---

[3] Excepting the words "abuse, humiliate and."

5

　　3. The appellant had the intent to degrade L.S. and to arouse and gratify his sexual desire.

10 U.S.C. § 920b(c) (2012); MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2016 ed.), Part IV, ¶45b.b(4)(c); Charge Sheet.

The appellant claims on appeal, as he did at trial, that he did not expose himself to the victim, L.S. He challenges L.S.'s and her father's identification of him as L.S.'s offender. He also claims that it was physically impossible for him to be at the scene of the 20 September 2016 exposure at the time L.S. claims the exposure occurred given the time that he departed from his office and the amount of time he would have needed to travel to the location of the exposure.

After carefully reviewing the record of trial and considering the evidence in the light most favorable to the prosecution, we are convinced that a rational fact-finder could have found all the essential elements beyond a reasonable doubt. Additionally, after weighing the evidence and having made allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt of the appellant's guilt.

L.S. had a good opportunity to observe the man who exposed himself to her and the vehicle he was driving. She immediately ran home—less than 100 meters away—after the incident. Within seconds of getting home she described the perpetrator and his vehicle to her father. Within seconds of talking to her father, the two of them got into their family vehicle to search for the perpetrator. Approximately two minutes later and in close proximity to the place where L.S. said a man exposed himself to her, L.S. and her father located a vehicle that matched L.S.'s description and photographed the vehicle. The vehicle in the photograph was the appellant's vehicle and the appellant admitted to CID and at trial that he was driving the vehicle the evening of 20 September 2016. The first photo of the appellant's vehicle was time-stamped 1901, placing the appellant close to the scene of the exposure shortly after it occurred. When Mr. S pulled up next to the suspect vehicle, L.S. identified the appellant as the man who had exposed himself to her just minutes before.

The appellant's argument that it was physically impossible for him to have been at the location where the exposure occurred at the time alleged is substantially undermined by the appellant's own evidence. The appellant used his identification card to "swipe out" of his office shortly before 1834 on 20 September 2016. When interrogated by CID, the appellant stated that he stopped to make a cell phone call about 5 to 10 minutes after leaving his base. He did not recall the street he stopped on to make the call, but he remembered that there were some stairs next to the road where he stopped.

Mrs. S., L.S.'s mother, had been with L.S. at her horseback riding lesson that afternoon. She and L.S. left the stables separately to get home: she in her car and L.S. on her bicycle. Mrs. S. testified that when she was driving home from the stables she saw a vehicle matching the appellant's vehicle stopped in the road down the street from her home. There were stairs near the road where Mrs. S saw the car stopped.

Examination of the appellant's Blackberry cell phone showed that he made a call to his wife at 1842, which lasted for less than four minutes, and a call to his uncle at 1847 which went unanswered. This timeframe was shortly before the time the crime occurred.

Furthermore, the appellant introduced substantial evidence to prove that he was a fast driver and regularly drove much faster than other drivers. This fact substantially undercuts the multiple estimates that the defense introduced regarding how long it would typically take a driver to travel from the appellant's office to the scene of the incident.

Most significantly, at 1901 L.S.'s father photographed the appellant in his car close to the site of the exposure, which was within minutes of the exposure. On that evidence alone a reasonable factfinder could have determined that appellant had sufficient time to drive from his office to the scene of the indecent exposure. We are convinced beyond a reasonable doubt of the same. We are also convinced beyond a reasonable doubt that the evidence satisfies the other elements of the offense.

## B. Trial Counsel's Pretrial Disclosure Obligations and the Military Judge's Denial of the Defense Request for Production of German Cell Phone Tower Data[4]

The appellant alleges that the government possessed and failed to produce certain items of evidence that were material to the preparation of the defense. Specifically, the appellant claims the government possessed (1) German cell phone tower locating data; (2) "location data" contained within the appellant's government-issued Blackberry cell phone; and (3) global positioning system (GPS) data contained within the appellant's vehicle. With regard to the German cell phone tower locating data, the appellant additionally alleges in a separate AOE that the military judge abused his discretion in denying the appellant's motion to compel production of that data. We will address each category of evidence separately.

---

[4] This subsection combines our discussion of AOEs 2 and 3.

*1. German cell phone tower data*

The appellant challenges both the trial counsel's failure to discover the requested German cell phone tower locating data and the military judge's denial of the appellant's motion to compel production of such data.

The trial counsel argued at trial that the government was not in possession of any cell tower data and, since the data was proprietary to a German telecommunications company, it was not amenable to subpoena from a U.S. court-martial. The military judge denied the appellant's motion to compel production of the cell tower data on the bases that the appellant had not shown its relevance and that the data was not subject to compulsory process issued by the court-martial. The military judge also invited the appellant to re-raise the motion at a later date if he could meet the burden for relevance.[5] The motion was not re-raised by the appellant.

The defense is entitled to an equal opportunity to obtain evidence. Art. 46, UCMJ. However, it is not entitled to production of evidence that is "destroyed, lost, or otherwise not subject to compulsory process." RULE FOR COURTS-MARTIAL (R.C.M.) 703(f)(2), MCM. The data sought by the appellant was proprietary information possessed by a German telecommunications company. Contrary to the appellant's assertion that the U.S. government was in "direct possession" of the German cell phone tower data,[6] we find, as did the military judge, that the U.S. government was not in possession of the data. Also contrary to the appellant's claim, and consistent with the military judge's finding, we determine that the data was not subject to the compulsory process of a U.S. court-martial. The appellant's reliance on the North Atlantic Treaty Organization Status of Forces Agreement, which Germany and the United States are party to, is misplaced. The treaty provides for mutual law enforcement assistance, but not for mandatory evidence sharing between parties.[7]

The trial counsel stated that he would submit a request for the data through the German authorities and the military judge stated that that was

---

[5] Record at 235-6.

[6] Appellant's Brief at 33.

[7] "The authorities of the receiving and sending States shall assist each other in the carrying out of all necessary investigations into offences, and in the collection and production of evidence, including the seizure *and, in proper cases, the handing over of objects connected with an offence.*" Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, art. VII(6)(a), June 19, 1951, 4 U.S.T. 1792, T.I.A.S. No. 2846 (emphasis added).

all he would ask the trial counsel to do.[8] It appears that the request was either denied or went unanswered since the record of trial is silent on any further developments.

Embedded in the appellant's argument is an unassigned allegation of error that by failing to turn over the cell tower records the trial counsel violated *Brady v. Maryland*, 373 U.S. 83 (1963) because the evidence would tend to negate the appellant's guilt.[9] *Brady* is implemented in the military justice system through R.C.M. 701. *United States v. Williams*, 50 M.J. 436, 400 (C.A.A.F. 1999). R.C.M. 701(a)(6) requires the trial counsel to disclose to the defense the existence of evidence known to the trial counsel which reasonably tends to, *inter alia,* negate the guilt of the accused.

In this case the cell tower data was not possessed by nor known to the trial counsel. Indeed, the appellant failed to establish at trial that the data even existed. We find that it is extremely unlikely that the cell tower data, assuming it existed, would have negated the appellant's guilt. The appellant argues without explanation that the "cell tower data" could have been used to triangulate the appellant's location at the time he made cell phone calls from his car on the date in question. He argues that this information could have proven that he was not close enough at the time he made the calls to have been at the scene of the crime when it was committed. The fault with this theory is that we know precisely where the appellant was located within a few minutes of the exposure because he was photographed by the victim's father at 1901. The appellant admits that the photo is of his vehicle at a time he was driving it. No matter where the cell tower data might have shown the appellant was at the moment he made a cell phone call, we know that he was close enough to the scene of the crime within minutes of the crime to have been there when it was committed. For these reasons, we find no *Brady* violation and no prejudice to appellant in the trial counsel's inability to procure cell phone tower data from the German telecommunications company.

Turning to the military judge's ruling on the production motion, we review the denial of this motion for abuse of discretion. *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015). An abuse of discretion occurs when the military judge's "findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the

---

[8] Record at 221.

[9] Appellant's Brief at 31.

applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008).

We find the military judge did not abuse his discretion in denying the motion. The military judge's findings of fact are supported by the record and he applied the appropriate rule of law. The military judge found, contrary to the appellant's claims, that the data sought was not possessed by the U.S. government and that he had no authority to compel its production. He also found that the appellant had not carried his burden for establishing that the requested evidence was relevant and necessary under MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 703, primarily because the appellant failed to show that he used his cell phone around the time of the exposure.[10]

The military judge's only alternative remedy, abatement, would have been an unreasonably drastic choice given that he found that the appellant had not met his burden of proving relevance. *United States v. Khoi Pham*, No. 201600313, 2018 CCA LEXIS 117, *16 (N-M. Ct. Crim. App. 8 Mar. 2018). The military judge's ruling was a reasonable choice based on the facts and applicable law.

Finally, the military judge advised the appellant to re-raise the motion if he could build a case for its relevance. The trial defense counsel acknowledged their burden:

> I would say the defense has met its burden if we can prove to the satisfaction of the Court that we can establish a phone call was made by Major Gurfein at this point in time. And I would say when we're able to do that, that should make the phone call logs relevant, which in turn makes the cell tower data relevant because we need the cell tower data to show where he was.[11]

In spite of the fact that the government later turned over the cell phone call log to the defense and that log revealed that the appellant had made two cell phone calls shortly before the time of the alleged indecent exposure, the appellant did not re-raise the motion.

### 2. *Blackberry cell phone location data*

The appellant requested his government-issued Blackberry cell phone call records in discovery. Location data from the phone was not part of his re-

---

[10] Although the call log from the appellant's cell phone was later introduced by the government, it was apparently not available when this motion was litigated.

[11] Record at 236.

quest. When initially told that the government could not produce the Blackberry call logs, the appellant moved to compel their production. Again, location data was not part of the motion to compel. The government presented evidence during the Article 39(a) motion session that it had tried but failed to extract call logs and location data from the Blackberry. The failure was attributed to an unspecified encryption problem with the phone. The military judge denied the motion to compel based on his finding that the defense had failed to meet its burden of persuasion for the relevance of the data. The military judge ordered the government to continue its efforts to extract the call logs and location data from the phone and invited the appellant to re-raise the motion later if he could establish its relevance. The government eventually extracted the call logs and provided them to the defense, but no location data was ever found by the government's digital forensic examiner. The appellant did not re-raise the motion.

On appeal, the appellant only challenges the trial counsel's failure to turn over the Blackberry cell phone location data as a general violation of the trial counsel's discovery obligations. He does not challenge the military judge's decision to deny his request to compel production of data from the phone.

The UCMJ guarantees an even playing field for prosecution and defense. They are entitled to an equal opportunity to obtain evidence. Art. 46, UCMJ. However, as noted above, they are not entitled to production of evidence that is "destroyed, lost, or otherwise not subject to compulsory process." R.C.M. 703(f)(2). Here, the government's investigators were unable to obtain the phone's location data from the Blackberry. Accordingly, the appellant could not meet his threshold burden of establishing that the location data existed. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004); *United States v. Watkins*, No. 201700073, 2018 CCA LEXIS 315, at *29-30 (N-M. Ct. Crim. App. 28 June 2018). Even if the appellant had requested the Blackberry location data in its discovery request, there was simply nothing in the government's possession to turn over. We find no error in the government's failure to disclose evidence that it had not been able to find.

### 3. GPS Data from the appellant's vehicle

The appellant did not request that the government produce GPS data from the appellant's vehicle, which had been impounded by the government. Nevertheless, the government attempted, but was unsuccessful in extracting the data from the vehicle and informed the appellant of that fact. The appellant did not make a motion to compel production of the vehicle's GPS data before he entered pleas. Such failure constitutes waiver if the appellant affirmatively declined to raise it. R.C.M. 905(e); *United States v. Avery*, 52 M.J. 496, 498 (C.A.A.F. 2000); *United States v. Owens*, No. 201300485, 2015 CCA LEXIS 1, at *8-11 (N-M. Ct. Crim. App. Jan. 8, 2015). Since the data was dis-

cussed as a subject of discovery at trial, but not raised in a defense motion, we will not say that the appellant *affirmatively* declined to pursue a motion to compel. As a result, we will test for plain error. *Avery*, 52 M.J. at 498.

Under the plain error standard, the appellant has the burden to show that: "(1) an error was committed; (2) the error was plain, or clear, or obvious; and (3) the error resulted in material prejudice to substantial rights." *United States v. Maynard*, 66 M.J. 242, 244 (C.A.A.F. 2008).

Here, the appellant fails to prove any plain or obvious error. The government attempted to extract GPS data relevant to the dates of the allegations from the appellant's car and was unable to do so.[12] There was no evidence to turn over to appellant.

## C. Trial Counsel's Invocation of the "Dark Web" and "Child Pornography" During Cross-Examination of Dr. Clipson and Rebuttal Argument

The appellant alleges that the trial counsel committed prosecutorial misconduct during his cross-examination of the defense expert psychologist, Dr. Clipson, and during rebuttal argument.

Prosecutorial misconduct is "action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996). The legal standard for prosecutorial misconduct was set by the Supreme Court in *Berger v. United States*, 295 U.S. 78 (1935), in which the Court described prosecutorial misconduct as behavior by the prosecuting attorney that "overstep[s] the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *Berger*, 295 U.S. at 84. The prosecutor, the Court said, "may prosecute with earnestness and vigor . . . . But while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id*. at 88.

"It is not the number of legal norms violated but the impact of those violations on the trial which determines the appropriate remedy for prosecutorial misconduct." *Meek*, 44 M.J. at 6. Reversal is warranted "when the trial counsel's comments, taken as a whole, were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014). When

---

[12] Record at 1204, 1227; PE 23.

weighing the damage caused by a prosecutor's misconduct appellate courts "should gauge the overall effect of counsel's conduct on the trial, and not counsel's personal blameworthiness." *United States v. Thompkins*, 58 M.J. 43, 47 (C.A.A.F. 2003).

With a proper objection at trial, appellate courts review questions of improper argument and prosecutorial misconduct *de novo*. *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017). Here, the appellant objected to both incidents he now claims to be prosecutorial misconduct.

Appellate courts balance three factors to test for prejudice: (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct; and (3) the weight of the evidence supporting the conviction. *United States v. Fletcher*, 62 M.J. 175, 184 (C.A.A.F. 2005).

### 1. Cross-examination of Dr. Clipson

At trial on the merits the defense called Dr. Clark Clipson, a forensic and clinical psychologist, as an expert witness. Dr. Clipson testified that he conducted a sexual offender evaluation on the appellant. The evaluation consisted of an interview and a battery of seven psychological tests. Based on Dr. Clipson's analysis of the results, he found no evidence of any kind of antisocial, narcissistic, or borderline personality traits or other psychopathology of the type associated with individuals who commit sexual offenses against children. Dr. Clipson testified that the psychological tests contain validation questions designed to reveal a test-taker who was trying to manipulate the test results by giving misleading answers.[13] Dr. Clipson testified that he found no indication from the validation questions that the appellant had attempted to manipulate his test results.

On direct examination, the defense counsel asked Dr. Clipson whether the appellant could have searched the internet to find the test questions to prepare for the test. Dr. Clipson replied: "He cannot. This test is rigorously protected by its publishers . . . . So there's no way — I mean, I have gone online and tried to see what you can find out about this test. There is nothing there."[14]

On cross-examination, the trial counsel sought to elicit testimony that the validation questions could be defeated if the test-taker had access to or knowledge of the test before taking it. Dr. Clipson testified that it was true,

---

[13] Record at 1458-63.

[14] Record at 1891-92.

but that the creators of the test had extremely stringent measures in place to protect their test from unauthorized disclosure. The trial counsel asked Dr. Clipson whether he was aware of the existence of the "dark web" and whether he knew that there were communities of child pornographers who used the "dark web" to trade pornography.[15] Dr. Clipson said he was aware of both.[16]

This portion of the cross-examination went as follows:

Q. Have you reviewed the dark web?

A. I have never been on the dark web. I read about it.

Q. You are aware there is child pornography on the dark web?

A. Very much so.

Q. You're aware that people trade child pornography on the dark web?

A. Yes.

Q. So you are aware that is a resource — you are aware that there is a — that there are child pornography communities on the dark web?

DC: Objection, Your Honor. No child pornography was found anywhere on any of Major Gurfein's electronics.

TC: That's not entirely accurate.

DC: The electronics were with CID and no child pornography was found during their search.

MJ: Response?

TC: For one, that's not an accurate statement. But for another, I am just establishing that there would be such things on the dark web. That's all I was going to do.

MJ: Well, all right. Let's –

DC: Your Honor, let's go to 39(a), please.[17]

We find that the trial counsel's line of cross-examination was an appropriate way for the trial counsel to test the witness' prior testimony that the

---

[15] Record at 1917.

[16] Record at 1917.

[17] Record at 1917-18.

tests he administered to the appellant were well protected from those individuals who were most likely to be subjected to them, *i.e.*, those who commit sex offenses against children.

The defense counsel's objection before members, "[n]o child pornography was found anywhere on any of Major Gurfein's electronics," although literally true, was misleading because it implied that all the appellant's electronic media had actually been searched for child pornography and none was found. In fact, his electronic devices had not been searched for child pornography. Some of his devices had been partially searched for GPS data. Trial counsel's response, "that's not entirely accurate," was also misleading because it implied that child pornography *had* been found on the appellant's electronics. The defense counsel's subsequent statement, "The electronics were with CID and no child pornography was found during their search," simply doubled-down on his initial misleading statement.

Under the invited reply doctrine, a trial counsel may fairly respond to a claim made by the defense. *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005). Trial defense counsel's speaking objection invited such a reply, but the reply had to be fair, even if the defense claim was not. We find that the trial counsel's statements, "That's not entirely accurate," and "that's not an accurate statement," were unfair because they were misleading. There was no evidence of child pornography in appellant's case. As the trial counsel explained to the military judge in the subsequent Article 39(a) session, his intended point was that not all of the appellant's electronic media had been searched by law enforcement and so it was misleading for the trial defense counsel to imply that it had been searched and nothing had been found.[18]

None of this back-and-forth should have been conducted in front of the members. The defense counsel should not have made a speaking objection in front of the members in an effort to introduce evidence, even though true, that there was no evidence of child pornography in the case. And trial counsel undoubtedly erred in responding to the speaking objection with such a misleading statement.

Both trial counsel and trial defense counsel bear some measure of responsibility for this situation. The defense counsel recognized his error when he acknowledged that he was "wrong" and that the trial counsel's response was "partly . . . my own fault in the speaking objection."[19]

---

[18] Record at 1922.

[19] Record at 1921.

Having found that the trial counsel's response was improper, we must next determine whether his response was so prejudicial "that we cannot be confident that the members convicted the appellant on the basis of the evidence alone." *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014). We look at "the overall effect of counsel's conduct on the trial, and not counsel's personal blameworthiness." *United States v. Thompkins*, 58 M.J. 43, 47 (C.A.A.F. 2003).

We find that all three factors of the *Fletcher* analysis resolve against the appellant.

### a. The severity of the misconduct

The trial counsel's erroneous statement, "that's not entirely true," was one isolated instance of misconduct in a very long trial. It occurred only once in the course of his cross-examination. He never uttered it again or repeated the idea before members. The misconduct took place during the trial and not during argument. The members deliberated for over nine hours before rendering a verdict. They acquitted the appellant of one of the two charged instances of indecent exposure. In the Article 120b specification of which they found the appellant guilty, they excepted out specific language. When directed by the military judge to move on to a different topic in his cross examination, the trial counsel complied. Finally, the fact that the trial counsel's cross-examination questions were appropriate and the defense counsel's speaking objection was misleading also tend to mitigate the severity of the misconduct. Based on these factors, we find that the trial counsel's misconduct was not severe.

### b. Measures adopted to cure the misconduct

We note that defense counsel did not request a mistrial as a remedy. Instead, he requested that the trial counsel not be allowed to further cross-examine Dr. Clipson regarding his knowledge of an unrelated subject: an extra-marital affair the appellant had had. The military judge stated that he would not allow the trial counsel to ask any further questions regarding the affair. The defense counsel also requested permission to put a CID investigator on the stand to ask about the scope of his search of the appellant's electronic media. The military judge granted that request. The military judge also directed the trial counsel to not ask any further questions about child pornography: "I'm inclined to just shut down this issue by not letting this wit-

ness be asked anything else about child pornography in association with this case."[20] He also instructed the members:

> I just want to give you a brief instruction. Whenever counsel object on issues, whatever the content of their objection may be, that is not evidence in front of you. You must totally disregard any statements that counsel make, substantive or otherwise, in their objections to the Court about evidence. The only evidence that you can consider in this case is the evidence that is properly admitted through witnesses on the stand or the evidence that you receive through documents or in my instructions.[21]

We find that the military judge took reasonable and effective measures to remedy the trial counsel's misleading statement.

### c. The weight of the evidence supporting conviction

The evidence against appellant regarding the 2016 allegation of indecent exposure was very strong. Multiple witnesses put the appellant close to the scene of the crime at the time the crime was committed. Mrs. S testified that she saw what appeared to be the appellant's car stopped in the road down the street from her home shortly before the offense took place. The timing of Mrs. S's observation is consistent with the time that the appellant stopped to make two phone calls on his cell phone. The appellant told investigators that he stopped to make his phone calls about 5 to 10 minutes after departing the base where his office was. L.S. identified the appellant's vehicle as the one driven by the man who exposed himself to her and her description of the perpetrator closely matched the appellant. Mr. S photographed the appellant's vehicle in close proximity to the scene of the crime just a few minutes after the offense took place. The appellant appeared to be trying to evade Mr. S when Mr. S started following him. We are confident that the members convicted the appellant on the basis of only the evidence properly admitted.

### 2. Trial counsel's comments in his rebuttal argument

The appellant also argues that the trial counsel committed misconduct during his rebuttal argument. "The legal test for improper argument is whether the argument was erroneous and whether it materially prejudiced the substantial rights of the accused." *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000). We find that the trial counsel's argument was not erroneous.

---

[20] Record at 1923.

[21] Record at 1927.

In his closing argument the defense counsel highlighted Dr. Clipson's testimony that the tests he administered to the appellant were unavailable to test takers: "And what did he say about those questions, gentlemen? It is impossible to track those questions down online. Impossible."[22] During rebuttal argument the trial counsel argued that Dr. Clipson testified that he had not checked the dark web or studies of the dark web to see if the pedophilia and paraphilia tests he administered to the appellant were available there. Trial counsel argued, "it is fair to conclude that there is criminal activity on the dark web where individuals could potentially get such tests."[23]

The trial defense counsel objected to this argument and the military judge asked the trial counsel for his response. The trial counsel responded that Dr. Clipson had testified on cross-examination that he had not searched the dark web and was aware that child pornography was traded on the dark web. Although the appellant now complains that the trial counsel's response in front of members constituted an impermissible speaking objection, it was the military judge who invited the trial counsel's response in front of members. The military judge subsequently gave a general instruction to the members that it is their recollection of what is in evidence that controls and not counsels' arguments.

A prosecutor may properly "argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence." *Baer*, 53 M.J. at 237. A prosecutor may not inject his or her personal opinion into the panel's deliberations, inflame the members' passions or prejudices, or ask them to convict the accused on the basis of criminal predisposition. *United States v. Burton*, 67 M.J. 150, 153 (C.A.A.F. 2009).

We do not find the trial counsel's statements during rebuttal argument to be erroneous. They were fair and appropriate comment on the defense evidence that the pedophilia test administered to the appellant was well protected from unauthorized disclosure.

## D. The Military Judge's Refusal to Sever the Specifications Concerning the 2014 and 2016 Incidents

We review a military judge's decision to deny an accused's motion to sever offenses for an abuse of discretion. *United States v. Duncan*, 53 M.J. 494, 497-98 (C.A.A.F. 2000). A military judge abuses his discretion when: (1) he predicates his ruling on findings of fact that are not supported by the evidence of

---

[22] Record at 2146.

[23] Record at 2172-73.

record; (2) he uses incorrect legal principles; (3) he applies correct legal principles to the facts in a way that is clearly unreasonable; or (4) he fails to consider important facts. *United States v. Solomon*, 72 M.J. 176, 180–81 (C.A.A.F. 2013).

There is a general preference in the military for the joinder of all known offenses at one trial. *United States v. Southworth,* 50 M.J. 74, 76 (C.A.A.F. 1999). "Ordinarily all known charges should be referred to a single court-martial." R.C.M. 601(e)(2), Discussion. That preference improves judicial economy and usually works to the benefit of an accused. "[U]nified sentencing by a court-martial favors joining all known offenses into a single trial, thus exposing the accused to only one sentence for his criminal misconduct, rather than a series of separate sentences." *United States v. Giles*, 59 M.J. 374, 379 (C.A.A.F. 2004) (quoting *United States v. Haye,* 29 M.J. 213, 215 (C.M.A. 1989)).

The burden is on the defense as the moving party to demonstrate by a preponderance of the evidence that severance is required. R.C.M. 905(c). The trial court has wide discretion in determining whether or not to sever offenses. An abuse of discretion will be found only "where the defendant is able to show that the denial of a severance caused him actual prejudice in that it prevented him from receiving a fair trial; it is not enough that separate trials may have provided him with a better opportunity for an acquittal." *United States v. Duncan,* 53 M.J. 494, 497-98 (C.A.A.F. 2000) (citations omitted).

Severance of offenses is required only to prevent manifest injustice. R.C.M 906(b)(10). The factors we consider when determining whether a military judge has abused his discretion in applying the "manifest injustice" test of R.C.M. 906(b)(10) are: (1) whether evidence of one offense would be admissible in the trial of the charged offense; (2) whether the military judge gave a limiting instruction to keep the evidence of the offenses separate; and (3) whether the findings reflect an impermissible crossover. *United States v. Southworth,* 50 M.J. 74, 76 (C.A.A.F. 1999); *United States v. Curtis,* 44 M.J. 106, 128 (C.A.A.F. 1996), *rev'd as to sentence on recon.*, 46 M.J. 129 (C.A.A.F. 1997).

The military judge ruled that the defense did not carry its burden in showing that severance was necessary to prevent a manifest injustice. Our analysis of the *Southworth/Curtis* factors leads to the conclusion that the military judge did not abuse his discretion in making this ruling.

On the first factor, the military judge found that evidence in each allegation would be admissible under MIL. R. EVID. 404(b) in the trial of the other allegations. Later in the trial the military judge modified his ruling to limit the government's use of MIL. R. EVID. 404(b) evidence such that evidence re-

garding the 2016 incident could be considered by the members to prove identity and intent in the 2014 incident, but not vice versa.

As to the second factor, the military judge gave both spillover and limiting instructions to the members to ensure the evidence was only used for proper purposes. The military judge's MIL. R. EVID. 404(b) limiting instruction reflected his decision to only allow the members to consider evidence of the 2016 incident in determining identity and intent in the 2014 incident. Further, the military judge instructed the members that they were not allowed to consider the evidence to infer, assume, or prove that the appellant had committed any other offense.

On the third factor, the findings do not indicate an impermissible crossover. The appellant was acquitted of all criminal conduct regarding the 2014 incident.

"A military judge's ruling constitutes an abuse of discretion only if it is 'arbitrary, fanciful, clearly unreasonable or clearly erroneous,' not if this Court merely would reach a different conclusion." *United States v. Sullivan*, 74 M.J. 448, 454 (C.A.A.F. 2015) (quoting *United States v. Brown*, 72 M.J. 359, 362 (C.A.A.F. 2013)). We find that the military judge's ruling on the severance motion was fair, reasonable, and in compliance with the law. The military judge appropriately and strictly limited the government's use of the evidence in question and the fact that the members acquitted the appellant of the 2014 incident indicates that they did not use the evidence inappropriately. The military judge did not abuse his discretion.

### E. Cumulative Error

We review allegations of cumulative error *de novo*. *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011).

"Under the cumulative-error doctrine, 'a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding.'" *Id.* (quoting *United States v. Banks*, 36 M.J. 150, 170-71 (C.M.A. 1992)).

"Courts are far less likely to find cumulative error where evidentiary errors are followed by curative instructions or when a record contains overwhelming evidence of a defendant's guilt." *United States v. Dollente*, 45 M.J. 234, 242 (C.A.A.F. 1996) (citations and internal quotations omitted). An appellate court will reverse only if it finds the cumulative errors denied the appellant a fair trial. *Id.* at 242 (citing *Banks*, 36 M.J. at 170-71).

Having found appellant's individual allegations of error to be without merit or without prejudice to his substantial rights, there is no need for us to

analyze the case further under the cumulative-error doctrine. *United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999).

### III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the approved findings and sentence are correct in law and fact and that no error materially prejudicial to the appellant's substantial rights occurred. Arts. 59 and 66, UCMJ. Accordingly, the findings and sentence as approved by the convening authority are **AFFIRMED**.

Chief Judge WOODARD and Senior Judge FULTON concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court